Edward T. Dicker and Nanette Dicker v. Commissioner. Jerome J. Frank and Emma Sue Frank v. Commissioner.
Dicker v. Commissioner
Docket Nos. 91032, 91033.
United States Tax Court
T.C. Memo 1963-82; 1963 Tax Ct. Memo LEXIS 263; 22 T.C.M. (CCH) 345; T.C.M. (RIA) 63082; March 20, 1963
*263 Held: 1. Payments of $211,664.18 each by Dicker and Frank to a corporation in which they indirectly had a stock interest were not contributions to capital. The payments were indemnity payments and represented deductible losses incurred in a closed transaction entered into for profit. 2. The operation of Dicker's farm did not constitute a transaction entered into for profit and the claimed loss is not deductible. 3. None of Dicker's expenses incurred on a trip to Europe were ordinary and necessary business expenses. The trip was primarily personal in nature and no expenses were shown to be allocable to any business activity. 4. Expenses incurred by Dicker on a trip to Las Vegas were not ordinary and necessary business expenses and are not deductible. 5. Entertainment expenses incurred in the promotion of the business of a corporation in which Frank indirectly held a stock interest are not his personal expenses and they are not deductible by him. Ronald M. Mankoff, Esq., and Wentworth T. Durant, Esq., for the petitioners. David E. Mills, Esq., for the respondent. BLACK Memorandum Findings of Fact and Opinion In these consolidated proceedings respondent determined deficiencies in income tax as follows: Docket
No.
Petitioners
Year
Amount
91032
Edward T. Dicker and
Nanette Dicker
1958
$85,685.85
91033
Jerome J. Frank and
Emma Sue Frank
1958
73,883.24
The adjustments to the income of Edward and Nanette Dicker and the explanation of the adjustments are set forth in the notice of deficiency as follows: Adjustments to Income
Taxable income reported on re-
turn
$157,949.17
Additional income and unallow-
able deductions: (a) Farm loss
$ 7,697.60
(b) Travel expense
2,818.42
(c) Loss on business
venture
211,664.18
222,180.20
Taxable income as corrected
$380,129.37
Explanations of Adjustments (a) It is held that the operation of your farm does not constitute *265 a transaction entered into for profit. The claimed loss from this operation is disallowed. (b) It is held that the cost of a trip to Europe, claimed as a business expense, and the expenses claimed in connection with gambling winnings at Las Vegas represented personal expense instead of ordinary and necessary business expense. The amount of $2,818.42 is disallowed. (c) It is held that the amount of $211,664.18, claimed as a loss on construction contract - 3525 Turtle Creek, Inc., represents a contribution of capital which is not an allowable deduction. The adjustments to the income of Jerome and Emma Sue Frank and the explanation of the adjustments are set forth in the notice of deficiency as follows: Adjustments to Income
Taxable income reported on re-
turn
$183,570.13
Additional income and unallow-
able deductions: (a) Loss on business
venture
$211,664.18
(b) Entertainment ex-
pense
2,303.52
213,967.70
Taxable income as corrected
$397,537.83
Explanations of Adjustments (a) It is held that the amount of $211,664.18, claimed as a loss on construction contract - 3524 Turtle Creek, Inc., represents a contribution of capital which is not *266 an allowable deduction. (b) It is held that $2,303.52 of the claimed deduction for entertainment expense represents personal expense and other expense which is not ordinary and necessary business expense. Computation of the amount disallowed follows: Registration fee - Camp Horseshoe -
Personal expense
$ 100.00
Set of golf clubs - Columbian Club
charge - Personal expense
279.00
Party given to promote the business
of 3525 Turtle Creek, Inc., Turtle
Room and Club, 3525 held not to
be ordinary and necessary business
expense
1,924.52
Entertainment expense disallowed
$2,303.52 The issues presented for determination are: 1. Whether the amount of $211,664.18 deducted from the income reported by each of the petitioners, Edward Dicker and Jerome Frank, is an ordinary loss on a transaction entered into for profit deductible in 1958 or whether it is a contribution of capital to 3525 Turtle Creek, Inc. 2. Whether Edward and Nanette Dicker operated their farm as a transaction entered into for profit and are entitled to claim a farm loss in the amount of $7,697.60 in 1958 3. Whether Dicker's expenses incurred in 1958 on a trip to Europe to the extent of $2,218.42 *267 are deductible as a business expense. 4. Whether Dicker's expenses incurred on a trip to Las Vegas in 1958 to the extent of $600 were ordinary and necessary expenses in the conduct of his business or were expenses of a transaction entered into for profit whereby Dicker reported income from gambling in the amount of $1,600. 5. Whether Jerome and Emma Sue Frank are entitled to a claimed deduction for business entertainment expenses of $2,303.52 in 1958. Findings of Fact A stipulation and a supplemental stipulation of facts, together with exhibits attached thereto, were filed by the parties and are incorporated herein by this reference. Edward and Nanette Dicker are husband and wife and reside in Roanoke, Texas, They filed a joint income tax return for the taxable year 1958 with the district director of internal revenue at Dallas. Jerome and Emma Sue Frank are husband and wife and reside in Dallas, Texas. They filed a joint income tax return for the taxable year 1958 with the district collector of internal revenue at Dallas. The term petitioners as hereinafter sometimes used will have reference to Edward T. Dicker and Jerome J. Frank. Issue 1 Loss or Capital Contribution
*268 Prior to 1950 petitioners were separately engaged in residential housing and construction businesses. In 1950 petitioners formed a partnership to conduct a construction business and to hold certain investments. In 1953 petitioners organized Dicker-Frank-Hexter Construction Company, a Delaware corporation. In 1955 its name was changed to Dicker-Frank & Associates, Inc., hereinafter called Associates. Petitioners were then the sole stockholders of Associates, each owning one-half of the outstanding shares. In January and March 1955 petitioners, individually or as partners, procured options to purchase certain properties on Turtle Creek Boulevard in Dallas. They had conceived an idea for building an elevated luxury apartment building on these properties. Prior to this time they had no experience in building elevated structures. In April 1955, petitioners applied for a loan from John Hancock Mutual Life Insurance Company, hereinafter called Insurance, in the amount of $3,000,000 on the proposed luxury apartment building. Petitioners' estimated costs submitted to Insurance totaled $4,720,000. During the early part of June 1955 petitioners prepared an estimate of construction and *269 acquisition costs totaling $3,061,497.40. This estimate was based in part on preliminary bids received from subcontractors. The estimate was submitted upon request to Republic National Bank of Dallas, hereinafter called the Bank. Petitioners were negotiating with the Bank to secure interim financing for the venture. The Bank also requested an estimate by an independent party and petitioners secured an estimate from a nationally known builder who estimated construction costs at $2,846,000. This estimate did not include the costs of the land or of the proposed swimming pool. The Bank agreed to furnish interim financing for the venture. Petitioners originally intended to liquidate some of their investments to furnish the capital for the venture which was not supplied by the loan. On July 19, 1955, Insurance approved a mortgage loan commitment on the property and proposed building for $2,700,000. This mortgage loan was based on approximately 62 percent of the following valuation: Land - 120,000 square feet at $3.00
$ 360,000
Building - 2,680,960 cubic feet at $1.40
3,754,000
Garage - 38,400 square feet at $6.00
230,000
Total
$4,344,000 Insurance's loan commitment *270 was based in part on the valuation of the physical assets and in part on the potential earnings of the apartment. In the spring of 1955, Empire Milwork Corporation, a New York corporation, hereinafter called Empire, studied the possibility of joining the venture. Empire hired a construction and consulting firm to confirm the project's investment possibilities and costs. The consulting firm's report was not issued until October 1955, sometime after Empire agreed to purchase an interest in Associates. The formal report of the consulting firm estimated land and construction costs at between $3,000,000 and $3,200,000. On July 22, 1955, Associates resolved to sell to Empire 34 shares of treasury stock owned by Associates and 34 shares of newly authorized stock for a total consideration of $400,000. It was further resolved that $340 of the proceeds of the sale would be allocated to capital and $399,660 would be allocated to capital surplus. As a result of the sale of stock to Empire, petitioners each owned 25 percent of the stock of Associates and Empire owned 50 percent. Petitioners were unrelated to and owned no interest in Empire. On August 8, 1955, 3525 Turtle Creek, Inc., hereinafter *271 called Turtle Creek, was organized by petitioners under the laws of the State of Texas. The amount of the capital stock of Turtle Creek was $1,000 divided into 100 shares each of a par value of $10. Petitioners received all the stock of Turtle Creek except for two qualifying shares. On October 20, 1955, all shares of Turtle Creek stock owned by petitioners were transferred on the stock record book of Turtle Creek to Associates. On October 20, 1955, an agreement was entered into between Turtle Creek, Associates, and petitioners. By the agreement petitioners transferred their land options covering property at and adjacent to 3525 Turtle Creek Boulevard to Turtle Creek. Turtle Creek was to exercise the options and have the land conveyed to it. Turtle Creek was to construct a multistoried apartment building to be known as 3525 Turtle Creek on the land covered by the options, the apartment to be constructed substantially in compliance with plans and specifications therefor prepared by petitioners' architect. Petitioners further agreed to transfer the commitment from Insurance for a mortgage loan of $2,700,000 on said project to Turtle Creek. The interim financing agreement was also to *272 be transferred to Turtle Creek. Turtle Creek agreed to enter into a contract with Associates as general contractor for construction of the said apartment project whereby Associates was to be reimbursed by Turtle Creek for its actual "project costs" which were defined so as not to include the salaries of any officers or directors of Associates. Finally, it was agreed that petitioners would sell all their Turtle Creek stock to Associates for $1,000 with the result that Turtle Creek would be a wholly owned subsidiary of Associates. In October 1955 petitioners reestimated land and construction costs at $3,200,000. On January 30, 1956, Turtle Creek and Associates entered into a contractual agreement whereby Associates was named general contractor of the multistoried apartment project. In this contract it was specifically agreed that contractor's costs (project costs) would not include any general overhead costs of Associates. The original specifications for the apartment house were completed by the architect in March 1956. There were six addenda to the specifications before construction began making changes in the specifications for economic reasons and for adding improvements. In *273 addition, there were a number of change orders drafted after the construction began which in part were due to requests by future tenants who wanted alterations in basic plans. In May 1956, petitioners sought to increase the mortgage loan commitment from Insurance which request was refused. At that time petitioners represented that estimated costs would be $5,707,000 as opposed to the original estimate of $4,720,000 submitted to Insurance in April 1955. Sometime during the summer of 1956, the Bank advised petitioners that they would not proceed with the interim financing unless additional cash was put into the venture. Petitioners did not have the cash available and they sought outside capital. Petitioners investigated various loan companies in the Dallas area but were unable to find a lender. Sometime during May or June 1956, Charles R. Rudinger, hereinafter called Rudinger, president of C. R. Rudinger, Inc., hereinafter called Rudinger, Inc., a New Jersey corporation, expressed interest in the venture. Prior to this time, Rudinger was unknown to petitioners nor did they hold or ever hold any interest in Rudinger, Inc.Rudinger studied the venture and determined that it could be *274 completed at a total cost of not more than $3,600,000, which did not include a general contractor's fee. Rudinger also contacted the consulting firm used by Empire to help him reach a decision as to the project's ultimate costs and profitability. Rudinger proposed, as a condition to Rudinger, Inc.'s entry into the venture that costs be guaranteed by petitioners not to exceed $3,800,000 and he proposed that a supervisory fee be paid to petitioners as set forth in the following agreement. On August 1, 1956, an agreement was made by and among Empire, Associates, petitioners, jointly and severally, Turtle Creek, and Rudinger, which provided, inter alia, as follows: AGREEMENT, made this 1st day of August, 1956, by and among EMPIRE * * * EDWARD T. DICKER and JEROME J. FRANK, jointly and severally, both of 911 St. Joseph Street, Dallas, Texas, * * * and * * * RUDINGER, INC., * * * (hereinafter referred to as the "Purchaser"). WITNESSETH: WHEREAS, Turtle Creek owns and is in the process of constructing an apartment house project located at 3525 Turtle Creek Boulevard, Dallas, Texas; and WHEREAS, Turtle Creek has made arrangements for temporary financing with the Republic National *275 Bank, of Dallas, Texas, to the extent of approximately $2,700,000.00; and WHEREAS, Turtle Creek has made arrangements for permanent financing with the John Hancock Mutual Life Insurance Company of Boston, Massachusetts, for the sum of $2,700,000.00; and WHEREAS, additional sums will be required for the purpose of completing the said apartment house project, estimated by all the parties at approximately $1,000,000.00; and WHEREAS, Empire and Dicker and Frank have each heretofore advanced to Turtle Creek certain sums in connection with the financing of the said apartment house project; and WHEREAS, Associates owns all of the issued and outstanding shares of the capital stock of Turtle Creek, which stock consists of 100 shares, each of the par value of $10.00; and WHEREAS, the Purchaser is desirous of buying a one-third (1/3) interest in and to the capital stock of Turtle Creek, and Associates is desirous of selling the same to the Purchaser; and WHEREAS, the parties desire to agree as among themselves with regard to the furnishing of the necessary financing for the completion of said apartment house project; and WHEREAS, the parties are desirous of engaging the services *276 of Associates to act as General Contractor in the construction of the said apartment house project, and Associates is desirous of acting as such General Contractor; and WHEREAS, the parties are desirous that Dicker and Frank devote their services to Associates in the performance of the general contract for the construction of said apartment house project, and Dicker and Frank are desirous of, and willing to, devote their services to Associates for said purpose; and WHEREAS, the parties are desirous of fixing the compensation to be received by Dicker and Frank for their services as aforesaid, which compensation shall be contingent upon the fulfillment of certain guarantees, as herein contained. NOW, THEREFORE, in consideration of the mutual covenants hereinafter contained and the sum of $1.00 in hand paid to each of the parties hereto, receipt whereof is hereby acknowledged, the parties do mutually covenant and agree as follows: 1. Each of the parties represents and warrants to the Purchaser that the sole issued and outstanding shares of the capital stock of Turtle Creek consist of 100 shares, each of the par value of $10.00, all of which are owned free and clear of all liens, *277 encumbrances or claims of any kind, nature or description by Associates, except that the same are being held as collateral by the Republic National Bank, of Dallas, Texas, to secure repayment of the aforesaid temporary building loan. 2. Associates does agree to sell, assign, transfer and set over to the Purchaser, and the Purchaser does hereby agree to purchase from Associates, 33 1/3 shares of the said capital stock of Turtle Creek, constituting a 1/3 interest in and to said corporation, for the sum of $333.33, receipt whereof is hereby acknowledged. 3. The Purchaser does herewith agree, in addition to purchasing the aforesaid shares of capital stock of Turtle Creek, to purchase from Turtle Creek deferred payment non-negotiable registered debenture notes of Turtle Creek in the total sum of $333,000.00, for which the Purchaser agrees to pay to Turtle Creek the sum of $333,000.00 as follows: $75,000.00 upon the execution of this Agreement $75,000.00 on August 17, 1956, and the balance of $183,000.00 as Turtle Creek requires the said sum. Said notes shall be delivered as the aforesaid funds are paid in. 4. The said deferred payment non-negotiable registered debenture notes to be *278 issued to the Purchaser and to be issued to the other parties, as hereinafter set forth, shall bear interest at the rate of 8% per annum from the date of issuance, * * * 5. Empire and Dicker and Frank agree that they shall similarly purchase from Turtle Creek deferred payment non-negotiable registered debenture notes of said Turtle Creek in the following manner. The Parties acknowledge that Empire has already advanced to Turtle Creek sums in excess of $333,000.00. In exchange therefore, Empire shall accept from Turtle Creek its deferred payment non-negotiable registered debenture notes in the sum of $333,000.00, payable in the same manner as those payable to the Purchaser. As to any excess advance already made by Empire to Turtle Creek, the same shall be repayable to Empire on demand, in cash. The parties acknowledge that Dicker and Frank have similarly advanced sums to Turtle Creek, which sums, however, do not equal $333,000.00. Dicker and Frank agree that, as required by Turtle Creek, they shall advance up to a total, including past advances, of $333,000.00 for which sums they shall receive from Turtle Creek deferred payment non-negotiable registered debenture notes of Turtle *279 Creek in the amount of said advances, repayable in the same manner as those delivered to the Purchaser. * * *
8. In consideration of the foregoing, Associates does herewith agree to act as general contractor in the construction of the said apartment house project, located at 3525 Turtle Creek Boulevard, Dallas, Texas, and agrees to do whatever may be necessary to complete the construction of said project, * * *
9. Dicker and Frank, in consideration of the foregoing, do hereby each agree to individually spend whatever time may be required in the supervision, handling, management and performance of the aforesaid general contract by Associates, for which services Turtle Creek agrees to pay them the total sum of $100,000.00, subject, however, to the following terms and conditions. In consideration of the mutual covenants herein contained in this Agreement, Dicker and Frank do herewith guarantee to all parties to this Agreement that the total cost of the construction of this project, including the initial cost of land, all carrying charges until the project is fully completed, interest, taxes, insurance, legal, architect and engineering fees, permits and any and all other *280 charges and costs in connection with the said project, including, but not limited to, the complete construction of the project, a greenhouse and equipment thereon, putting green, landscaping, furnishing of the lobby, carpeting of the lobby and corridors, installation and equipping of swimming pool, advertising, rental commissions, shall not exceed, including their foregoing fee of $100,000.00, the sum of $3,700,000.00. Should the actual cost, exclusive of their foregoing fee of $100,000.00, exceed the sum of $3,600,000.00, then their fee shall be the difference between said sum and the said sum of $3,700,000.00. Should the actual cost of the project, exclusive of their fee, exceed the sum of $3,700,000.00, there shall be no fee payable to said Dicker and Frank. In the event the actual cost exceeds said sum of $3,700,000.00, Empire and the Purchaser agree that they shall cause loans to be made by themselves in equal sums to Turtle Creek to the extent of said deficit, but not exceeding the sum of $50,000.00 from each. These loans shall have priority in repayment to any of the deferred payment non-negotiable registered debenture notes or other sums that may be due from Turtle Creek to *281 any of the parties hereto and shall be repayable out of the first moneys available. Said loans shall bear interest at the rate of 6% per annum and shall be payable upon demand, subject only to the foregoing limitation and condition. In the event the actual cost of the project exceeds the sum of $3,800,000.00, Dicker and Frank shall personally pay the said excess cost without reimbursement of any kind to themselves from any of the parties, and Dicker and Frank do hereby agree to, and do hereby, indemnify each and all the parties to this Agreement as against any cost of said project of any kind, manner or description whatsoever, in excess of $3,800,000.00. In computing the cost of the project, interest payable on the deferred payment non-negotiable registered debenture notes shall not be included. * * *
11. Dicker and Frank agree that they shall be responsible for the procurance and handling of the temporary financing with the said Republic National Bank, of Dallas, Texas, or with any other lending institution that may be required, the actual cost, however, to be included in the cost of constructing the project. * * *
15. Dicker and Frank agree that they shall, at all times, *282 cause Associates to keep full and accurate records of the cost of the apartment house project, which records shall be made available for inspection at all reasonable times and places to the Purchaser and Empire. On August 1, 1956, Turtle Creek stock was reissued, 66 2/3 shares to Associates and 33 1/3 shares to Rudinger, Inc.
Construction of the apartment building began around the first of July 1956. Petitioners or Associates hired their own construction superintendent in order to realize a savings on concrete work under that estimated by them in June 1956. They did not subcontract the concrete work. The specifications for the building called for unusually shaped concrete columns requiring precise form work, vibration of the setting concrete to avoid honeycombs in exposed concrete surfaces and exact positioning of grill-work anchors. Additional costs were incurred in these construction activities not anticipated in the earlier estimates. Necessary construction changes were also made relating to acoustics and electrical transformers adding to cost. During 1957 construction of the elevated floors was in progress. Normal construction techniques were not found to be satisfactory *283 because the plans called for exposed concrete of a specific color which could not be patched or rubbed. The rainfall in the spring of 1957 was three times that of normal which delayed construction and added to labor costs for concrete work. Flooding buckled the basement floor and the basement concrete slab had to be replaced. A new drainage system was also installed. Substantial additional costs over estimates for exterior concrete grill-work were incurred. Construction was ultimately completed 6 months behind schedule, whereby additional financing charges and insurance premiums were incurred. Prior to completion, on or about November 12, 1957, petitioners made application to Insurance for an increase in the mortgage loan commitment with regard to the Turtle Creek apartment house from $2,700,000 to $3,700,000. Insurance issued a commitment for an increase of $300,000 on its loan to Turtle Creek on December 3, 1957. In light of this commitment, on December 17, 1957, an amendment of the agreement of August 1, 1956, was executed whereby, among other things, petitioners' duty to indemnify construction costs was raised from $3,800,000 to $4,000,000. Empire and Rudinger, Inc., were relieved *284 of the obligation to lend an additional $50,000 each if construction costs exceeded $3,700,000. After completion, Rudinger, Inc., and Empire demanded that petitioners indemnify Turtle Creek for costs in excess of $4,000.000. Petitioners each paid $211,664.18 to Turtle Creek in 1958 under their indemnity agreement and each claimed an ordinary loss on his income tax return for 1958 as a "Loss on Construction Contract" for this amount. Turtle Creek sold its assets in December 1959 and was thereafter in a state of liquidation. Issue 2 - Farm Operation In 1955 Edward and Nanette Dicker acquired a 130-acre farm at Roanoke, Texas, for $92,000. The property included a house with three bedrooms, three baths, and a library. The Dicker family has used the farm as their residence from the date of acquisition. Dicker claimed farm losses with respect to the Roanoke property on his income tax return for each year from its acquisition in 1955 through 1959 in the following amounts: Year
Reported Loss
1955
$ 3,933.96
1956
7,822.71
1957
7,611.73
1958
7,697.60
1959
2,786.58
Total
$29,852.58 Gross sales receipts and gross profits or loss from the sale of farm products *285 from the Roanoke property reported by Dicker on his income tax returns for the years 1955 to 1959 inclusive, are as follows: Gross
Gross
Year
Receipts
Profit (Loss)
1955
0
[70.00)
1956
$ 480.50
101.92
1957
189.00
(648.50)
1958
Not shown
352.00
1959
1,043.32
793.32
$1,712.82
$528.74
Respondent determined that the operation of the Dicker farm did not constitute a transaction entered into for profit and thereby disallowed the operation loss. Prior to 1959 Dicker employed a full-time foreman on the farm. Thereafter, Dicker's sons assisted him in doing the work on the farm. Soon after purchase, Dicker acquired 15 head of cattle and one horse for the farm. In 1956 he acquired 22 goats for purposes of grazing on underbrush but they were sold in 1958. He also built chicken coops, acquired chickens, and sold eggs. In 1956 he sold 10 head of cattle for $43.05 per head. In 1957 he acquired a quarter horse for $1,000. In 1959 the five remaining head of cattle were sold for $40 per head. During 1958, Dicker claimed $890.07 as depreciation on a station wagon and $1,680.62 as depreciation on another automobile, which amounts were included in his *286 farm losses. Issue 3 - European Travel Expenses During 1958 Edward and Nanette Dicker traveled in Europe. Dicker allocated one-half of the total cost of $8,873.70 of the trip to his wife's expenses and one-half of his share of expenses to personal nonbusiness expenses. As to these he took no deductions. He deducted 25 percent of the cost of the trip as a business expense. Issue 4 - Las Vegus Travel Expenses During 1958 Dicker made a trip to Las Vegas. He deducted $600 in expenses for this trip wherein he also reported earnings from gambling in the amount of $1,600. Issue 5 - Entertainment Expenses During 1958 Frank gave five parties at the Turtle Creek apartment house at a total cost of $1,924.52. The guests at Frank's parties were prospective tenants, men in the insurance business and the finance business, and prospective customers of the building's facilities. Frank was an officer of Turtle Creek; his duties included the leasing of the apartment building. Apartments were rented at 3525 Turtle Creek Boulevard as a result of the parties given by Frank and the parties' guests were subsequent customers of the apartment building's facilities. Frank was acting as agent of *287 the corporation 3525 Turtle Creek, Inc. in giving these parties. Opinion Issue 1 - Loss or Capital Contribution BLACK, Judge: Petitioners' contention with respect to this first issue which involves both Dicker and Frank is that they each suffered a deductible loss of $211,664.18 in 1958 because of their payments to Turtle Creek pursuant to an obligation under the contractual agreement dated August 1, 1956 (amended December 17, 1957). Petitioners contend that these were payments under an indemnity contract on a transaction entered into for profit. Respondent contends the payments were not losses but contributions to the capital of Turtle Creek (in which they were substantial indirect owners), not resulting from a closed transaction in 1958 and that petitioners' ultimate loss or profit on the venture cannot be measured until their stock and other interests in Turtle Creek are sold or otherwise disposed of. There is no dispute as to the amount of the payments or that the payments were actually made to Turtle Creek in 1958. As a general rule, the acquisition of property does not give rise to gain or loss and where there is merely a substitution of assets there is no taxable event, *288 Phil Kalech, 23 T.C. 672 (1955); Ruth M. Cullen, 14 T.C. 368 (1950). It is the final disposition of property that gives rise to a gain or loss for tax purposes. Respondent contends that the general rule is applicable herein and that petitioners' gain or loss on the venture should not be taken into account for tax purposes until their stock interests in Turtle Creek are sold or redeemed. [1]
Petitioners, of course, have the burden of proof to overcome the presumption of correctness of respondent's determination. More specifically, petitioners have the burden to establish that they suffered a loss, that they realized no equivalent benefit from the transaction, and that the loss resulted from a transaction entered into for profit. The transaction in question is represented by the agreement dated August 1, 1956, whereby petitioners agreed to act in a supervisory capacity during construction of the department house and were to receive for their services $100,000. Petitioners also agreed to indemnify Turtle Creek if land and construction costs exceeded $3,800,000. If this *289 contract is valid and is not a sham, then we believe there is no question but that the transaction was one entered into for profit and if a loss subsequently occurred then it is a loss resulting from a closed transaction, deductible in the year of payment. [2]
Respondent takes the position that this agreement was a sham because petitioners knew at the time this agreement was negotiated that total costs were going to exceed $3,800,000. Respondent argues since petitioners intended at that stage of the venture to contribute all the necessary capital over the funds received on the permanent mortgage loan that their alleged payments under the indemnity contract were merely disguised contributions to the capital of Turtle Creek in accordance with their original intention. Respondent, however, would have to *290 ignore certain facts in order to reach this conclusion. In the first place, petitioners obviously changed their plans about contributing all the necessary capital to the venture - the facts make this clear. A 50 percent interest in Associates was sold to Empire, a corporation in which petitioners owned no interest whatever, in 1955 for a total consideration of $400,000. Soon after, all Turtle Creek stock was transferred to Associates so that Turtle Creek was a wholly owned subsidiary of Associates. Empire's investment in Associates was obviously to be used for the Turtle Creek venture. At a later time Rudinger, Inc., in which petitioners also owned no interest whatever, made an investment in the venture in exchange for one-third of the Turtle Creek stock. After the addition of the two other parties to the venture, who held two-thirds of the interest in the project, petitioners would not likely, we think, be willing to contribute all the necessary capital without a proportionate increase in their stock ownership in Turtle Creek. In addition, respondent relies heavily on the fact that petitioners' estimates submitted to Insurance showed total costs far in excess of the estimates used *291 by petitioners and the other parties to the agreement of August 1, 1956. Respondent concedes, however, that it is the usual practice in the trade to use highly inflated estimate costs so that the permanent lender furnishes the maximum amount of capital. It was well known that the mortgage loan would be based upon 62 percent of the lender's valuation of the project. Also, it was known that the lender's valuation would not be based solely on costs. Insurance was more interested in the worth of the project with respect to its earnings and made its own valuation of the project. In July 1955, Insurance valued the apartment house at $4,344,000. Respondent also ignores that the parties involved were dealing at arm's length. While it is true that petitioners held substantial interests in Associates (and thereby indirect interests in Turtle Creek), Empire and Rudlinger, Inc., were independent parties who had their own interests in the venture to protect. The agreement dated August 1, 1956, was basically between petitioners, Empire, and Rudinger, Inc. By the terms of the agreement petitioners were to be entitled to a supervisory contractor's fee if certain conditions were met. Respondent *292 concedes on brief that a $100,000 fee for their services would appear to be reasonable. This fee, payable to petitioners, was the consideration given by the other parties, Empire and Rudinger, Inc. Empire and Rudinger, Inc., each obtained or had a onethird interest in the venture and each of them was obligated to loan up to $333,000 to the venture. In exchange, petitioners promised to indemnify Turtle Creek for costs over $3,800,000. Empire and Rudinger, Inc., thereby created a ceiling for their respective investments. Each of them could not be called on to loan more than an additional $50,000. As hindsight shows, this proved to be a good bargain for Empire and Rudinger, Inc., but looking at the contract at the time it was made it would appear that petitioners received adequate consideration for their promise of indemnity. Petitioners not only found the additional financing they needed but they also had an opportunity to earn the supervisory contractor's fee. By the time the agreement in question was executed the petitioners had revised their estimate upward to $3,600,000. Planned improvements to the building and more exact subcontracting bids accounted for the difference over the *293 earlier estimates. The $3,600,000 cost estimate was used as a basis for the August 1, 1956, agreement. Rudinger, Inc.'s independent appraisal confirmed this estimate. It is to be noted that once Empire and Rudinger, Inc., were parties in the venture, petitioners could not deal with Turtle Creek in the same manner that they may have if it was entirely their own venture. It is true that a contribution to capital would merely increase indirectly their stock basis in Turtle Creek, whereas a loss would be deductible at ordinary income tax rates. But any tax saving realized by petitioners would be more than offset by the dilution of their contribution among the other stockholders. The parties to this agreement of August 1, 1956, agreed to pay petitioners their fee of $100,000 with the limitation that their fee would be reduced by the amount that costs exceeded $3,600,000. If costs exceeded $3,700,000 petitioners would not earn a fee and Empire and Rudinger, Inc., could be called upon to loanup to an additional $100,000. Any costs over $3,800,000 fell on petitioners under the indemnity clause. At this time, construction of the apartment house had barely begun. The engineering problems and *294 extremely wet spring of 1957 could not be foreseen. Petitioners no longer intended to supply all the capital to the venture and, as a consequence, they were dealing at arm's length with Rudinger, Inc., and Empire when the agreement of August 1, 1956, was executed. From the evidence presented, we cannot conclude that in August 1956 petitioners knew that costs would exceed $3,600,000 and that the agreement was a mere sham. The agreement of August 1, 1956, was modified in December 1957. The permanent mortgage loan from Insurance had been increased from $2,700,000 to $3,000,000. The work on the apartment building was beset with many engineering and weather problems. In December 1957, the parties realized that the original estimates of costs made in the summer of 1956 would be much too low. In light of the increased permanent loan, the parties agreed to raise petitioners' indemnity figure from all that was above $3,800,000 to all that was above $4,000,000. In exchange for raising the indemnity limit by $200,000, Empire's and Rudinger, Inc.'s obligation to contribute an additional $50,000 each was canceled. Once again we believe that the parties were dealing at arm's length protecting *295 their own interests. Rudinger, Inc., and Empire agreed to raise the indemnity figure in exchange for the cancellation of their obligation to invest additional funds in the venture. We do not believe that the agreement dated December 17, 1957, was a sham. The parties' stock interests in Turtle Creek owned directly or indirectly remained the same. It is difficult for us to see why petitioners would be willing to contribute additional sums to Turtle Creek as capital without receiving a larger share of the equitable ownership of the corporation, unless they were required to do so by the terms of an indemnity clause negotiated at arm's length. By December 1957 it was apparent to petitioners that they had entered into a bad bargain in August 1956 and they did manage to modify that agreement by raising the indemnity figure. We cannot conclude from this that the original agreement was a sham or that the transaction was not one originally entered into for profit. There is no evidence to show that Turtle Creek, Empire, and/or Rudinger, Inc., agreed subsequently to compensate petitioners for their losses after taxes. There is no evidence of any certificate of indebtedness payable to petitioners *296 from any of the parties. To the contrary, petitioners' evidence shows that the parties were merely satisfying their contractual obligations. It appears that petitioners did not realize any equivalent benefit as a consequence of their payments - they were merely making good their indemnity agreement. Accordingly, we conclude that they realized losses to the extent of amounts paid out in the year of payment. On this issue petitioners are sustained. Issue 2 - Farm Operation Dicker has claimed in 1958, as he has in every year of operation shown, a substantial loss from the operation of the 130-acre farm which also serves as the Dicker family residence. The property is located at Roanoke, Texas, which is about 30 miles from Dallas. We do not believe there is enough farming or ranching activity indicated by the record to support petitioner's contentions. The largest amount of livestock was 15 head of cattle, one horse, and 22 goats in the year 1956. In the same year, 1956, petitioner sold 10 of the cattle for $43.05 per head and disposed of the other five head in the year 1959. The evidence indicates that these 15 head of cattle were the only cattle Dicker ever kept there. In 1957, *297 he acquired a $1,000 quarter horse; the other horse and the five remaining head of $40 cattle would not justify such an expenditure. In 1958 all the goats were sold. The gross profit from the sale of eggs was negligible. Dicker has claimed a loss on the operation of the farm since its purchase. The gross profits have been very small. While the absence of profit for a number of years is not conclusive, even where the farm represents an alleged ancillary business, we cannot find that the evidence supports the contention that the farm was a transaction entered into for profit. In 1958, Dicker had only five head of cattle and two horses on the farm. Dicker was certainly not building up an inventory. The Dickers did, however, maintain a large residence on the property and we are of the opinion that the property was used primarily for their personal desires, cf. McGhee v. Commissioner, 264 F. 2d 232 (C.A. 6, 1959), affirming a Memorandum Opinion of this Court, and Margaret Batts Tobin, 11 T.C. 928 (1948), reversed on other grounds, 183 F. 2d 919 (C.A. 5, 1950). Of the total amount of $7,697.60 claimed as a farm loss, $1,680.82 actually relates to *298 the depreciation of one of Dicker's automobiles which he claims was used in his construction business. The evidence does not show that this automobile was used primarily for business purposes or that it was an ordinary and necessary expense. We sustain respondent's disallowance of the total amount of $7,697.60. Issue 3 - European Travel Expenses Dicker alleges that he devoted 50 to 75 percent of his time on a trip to Europe to the investigation of construction methods, the location of motel sites, and to interviewing personnel for his United States hotelmotel operations. Schedule 10 attached to his return explained the claimed expenses as follows: During this trip abroad, visits were made only to major foreign cities such as London, Rome, Paris, and Stockholm. In each city, taxpayer observed apartments and hotels to discover most advanced architectural designs for use in taxpayer's business of building luxury apartments which were under construction or in the planning stage. Dicker allocated 25 percent of the total cost of the trip to business expenses and claimed a deduction in the amount of $2,218.42. We are of the opinion that the trip was primarily personal in nature. *299 His wife Nanette accompanied him on the trip and it was estimated that her expenses amounted to 50 percent of the total expenses for which no deduction was taken. It is also conceded that at least 50 percent of his expenses were personal in nature and no attempt to deduct them is made. Section 1.162-2(b)(1) and (2) of Income Tax Regs. provides as follows: Sec. 1.162-2 Traveling Expenses. * * *
(b)(1) If a taxpayer travels to a destination and while at such destination engages in both business and personal activities, traveling expenses to and from such destination are deductible only if the trip is related primarily to the taxpayer's trade or business. If the trip is primarily personal in nature, the traveling expenses to and from the destination are not deductible even though the taxpayer engages in business activities while at such destination. However, expenses while at the destination which are properly allocable to the taxpayer's trade or business are deductible even though the traveling expenses to and from the destination are not deductible. (2) Whether a trip is related primarily to the taxpayer's trade or business or is primarily personal in nature depends on the *300 facts and circumstances in each case. The amount of time during the period of the trip which is spent on personal activity compared to the amount of time spent on activities directly relating to the taxpayer's trade or business is an important factor in determining whether the trip is primarily personal. If, for example, a taxpayer spends one week while at a destination on activities which are directly related to his trade or business and subsequently spends an additional five weeks for vacation or other personal activities, the trip will be considered primarily personal in nature in the absence of a clear showing to the contrary. Dicker has not shown any substantiation for the claimed business expenses during the trip and we have difficulty finding any substantial business activities during the trip that would permit Dicker to allocate any of his expenses within the terms of the above regulations. We hold for the respondent on this issue. Issue 4 - Las Vegas Travel Expenses Dicker's evidence concerning his alleged business expenses on a trip to Las Vegas is vague and general. He has not substantiated any of the claimed expenses. He claims that the expenses were either ordinary *301 and necessary business expenses and/or the expenses of a transaction entered into for profit. Apparently he won $1,600 in gambling on this trip which he reported as income in 1958. The evidence does not establish to our satisfaction that the expenses were incurred as ordinary and necessary business expenses. The expenses are not itemized nor is the nature of the trip given in any detail. There is insufficient evidence for us to conclude that the expenses were ordinary or necessary. In the alternative, Dicker apparently contends that the expenses were related to his gambling income as a transaction entered into for profit. If so, this was a personal expense and it is not deductible. [3] We hold for the respondent on this issue. *302 Issue 5 - Entertainment Expenses Respondent disallowed $2,303.52 of an alleged business deduction of $4,552.62 claimed by Frank on his 1958 return. The amount disallowed consists of the aggregate of three items claimed by petitioners which are set forth in the statutory notice. Frank offered no evidence to attempt to support his claim for the first two of these, namely, $100 for a registration fee to Camp Horseshoe and $279 for the purchase of a set of golf clubs; we shall assume he has abandoned these. The remaining amount in issue is $1,924.52 claimed as entertainment expense in giving parties to promote the business of Turtle Creek. Frank testified that several of the people at the parties subsequently became tenants of the apartment building and that quite a few of them subsequently became "customers of the facilities in the building." Frank further testified that he believed it was necessary in order to perform his duties as an officer of Turtle Creek to give these parties, that it was very good business, and proved that way later. We hold, however, that they were not ordinary and necessary expenses of Frank but those of Turtle Creek, cf. Horace E. Podems, 24 T.C. 21 (1955); *303 and Hal E. Roach, 20 B.T.A. 919 (1930). We hold for the respondent on this issue. Decisions will be entered under Rule 50. Footnotes
1. Turtle Creek was in a state of liquidation after all its assets were sold in 1959.↩
2. Internal Revenue Code of 1954. SEC. 165. LOSSES. * * *
(c) Limitation on Losses of Individuals. - In the case of an individual, the deduction under subsection (a) shall be limited to - (1) losses incurred in a trade or business; (2) losses incurred in any transaction entered into for profit, though not connected with a trade or business; * * *↩
3. Income Tax Regs. SEC. 1.212-1 Nontrade or Business Expenses. * * *
(c) Expenses of carrying on transactions which do not constitute a trade or business of the taxpayer and are not carried on for the production or collection of income or for the management, conservation, or maintenance of property held for the production of income, but which are carried on primarily as a sport, hobby, or recreation are not allowable as nontrade or business expenses. The question whether or not a transaction is carried on primarily for the production of income or for the management, conservation, or maintenance of property held for the production or collection of income, rather than primarily as a sport, hobby, or recreation, is not to be determined solely from the intention of the taxpayer but rather from all the circumstances of the case. For example, consideration will be given to the record of prior gain or loss of the taxpayer in the activity, the relation between the type of activity and the principal occupation of the taxpayer, and the uses to which the property or what it produces is put by the taxpayer.↩